IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

GAYLENE F. LANE,

      Plaintiff,

v.                                                 Case No. 2:14-2095-JTM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

      Defendant.

**MEMORANDUM AND ORDER**

      Plaintiff Gaylene F. Lane seeks review of a final decision by defendant, the Commissioner of Social Security ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, respectively. Plaintiff alleges multiple assignments of error with regard to the Commissioner's assessment of her residual functional capacity. Upon review, the court finds that the Commissioner's decision was supported by substantial evidence contained in the record. As such, the decision of the Commissioner is affirmed.

### I.      Factual and Procedural Background

      Plaintiff's medical issues date back to December 18, 2009, when plaintiff was involved in a car accident. Hours after this accident, plaintiff began complaining of back and neck issues. A CT scan of plaintiff's cervical and lumbar spine showed no gross fractures or dislocations, no soft tissue swelling, and normal vertebral body height and alignment. Several days after the accident, plaintiff saw her primary care doctor, Jeff Sloyer, complaining of neck and back pain.

Dr. Sloyer diagnosed plaintiff with cervical and lumbar strains and prescribed pain medication. In a follow-up appointment, Dr. Sloyer referred plaintiff to a chiropractor.

Plaintiff began a nine-week course of treatment with chiropractor Elton Taylor on January 12, 2010.  At her initial visit, plaintiff reported that her left arm and leg were tingly with some stabbing pain, and she rated her neck/back pain as a ten out of a possible ten.  Plaintiff also had noted tenderness upon palpation in her cervical, thoracic, and lumbar regions.  X-rays showed that plaintiff likely suffered from whiplash.  Taylor recommended regular adjustments as well as electrical stimulation with a Transcutaneous Electrical Nerve Stimulation ("TENS") unit. Records show that plaintiff attended several chiropractic sessions from January 12, 2010, through February 22, 2010, but also had multiple no-show appointments.

Plaintiff returned to Dr. Sloyer on February 17, 2010, still complaining of tightness and pain in her neck.  She claimed that muscle relaxers, pain pills, and stretching did not work and reported numbness and tingling down her left arm and leg.  Dr. Sloyer referred plaintiff for an MRI, which plaintiff underwent on February 20, 2010.  Images of plaintiff's cervical spine showed normal vertebral body height and alignment with: (1) disc space narrowing throughout her cervical spine, the most severe at C5-6 and C6-7; (2) posterior bulging at both the C5-6 and C6-7 vertebrae; (3) narrowing of the anterior epidural space at the C5-6 and C6-7 vertebrae; and (4) mild neural foraminal stenosis at the C5-6 and C6-7 vertebrae, which was greater on her left side.  There were no signs of significant canal stenosis.  Images of her lumbar spine showed mild disc space narrowing in the mid to lower lumbar spine and mild facet narrowing at the 4-5 and 5S1 vertebrae.  There was no evidence of fractures, dislocations, or impinged nerve roots and there was no significant canal or neural foraminal stenosis.  Dr. Sloyer diagnosed plaintiff with degenerative disc disease with no acute fractures.

On March 8, 2010, plaintiff saw Dr. Joseph E. Danda complaining of radiating pain in her back.  Plaintiff reported that her TENS unit and pain medication had been very helpful.  An exam revealed tenderness at the base of plaintiff's cervical spine, bilateral diffuse vague trapezium tenderness, and lumbar tenderness at the L5 vertebrae.  Plaintiff had good range of motion in her shoulders and her strength was five out of a possible five.  Dr. Danda administered an epidural steroid injection and ordered plaintiff to physical therapy and continued use of her TENS unit.

Plaintiff began physical therapy with Joan Kuhlmann, RPT that same day.  Kuhlmann noted that plaintiff was exquisitely tender in her lower back and neck and suffered from a reduced cervical range of motion.  Plaintiff rated her pain as a nine out of a possible ten. Kuhlmann recommended physical therapy for three to four weeks.  However, on April 1, 2010, Kuhlmann reported that plaintiff had missed three physical therapy sessions in a row.

Plaintiff returned to Dr. Danda on April 5, 2010, and reported excellent improvement in her back pain after the epidural injection.  She was still complaining of neck pain and Dr. Danda administered a second epidural injection.  Two weeks later, plaintiff again reported improvement.

However, during a May 24, 2010, appointment with Dr. Sloyer, plaintiff complained that the second epidural injection caused her symptoms and pain to worsen.  Dr. Sloyer noted that plaintiff had a reduced range of motion in her neck and tightness in her trapezius and paraspinal muscles.

On July 13, 2010, plaintiff saw Dr. John D. Ebeling.  She again reported that the epidural injections gave her "great relief."  Dkt. 8-1, at 426.  Plaintiff also reported taking sixteen oxycodone per 24-hour period and repeatedly dropping things when trying to hold them with her

3

left hand.  Plaintiff's examination in both her upper and lower extremities was largely normal, with the exception of infraspinatus issues on her left side, which caused her strength to be reduced to a 4.2 out of a possible five.  Dr. Ebeling also noted a reduced range of motion in plaintiff's cervical spine.  Based on his examination, as well as the results of plaintiff's previous MRI, Dr. Ebeling concluded that there was reasonable evidence that plaintiff suffered from left C7 radiculopathy.

Plaintiff returned to Dr. Ebeling on July 29, 2010, complaining of neck and left arm pain.  Dr. Ebeling noticed a swollen area over plaintiff's right lateral neck, which he diagnosed as a likely enlarged node.  Plaintiff had full strength in her arms and shoulders.  Dr. Ebeling concluded that his examination and the radiological test results showed no changes that would correspond to plaintiff's alleged discomfort that could be helped by surgery or further epidural injections.  He recommended that plaintiff "continue simple conservative measures."  Dkt. 8-1, at 424.

Plaintiff did not return to Dr. Sloyer until October 11, 2010.  At that time, she was still complaining of neck pain that was accompanied by radiculopathy into her left arm, causing numbness of her last three fingers.  Plaintiff told Dr. Sloyer that she believed she would benefit from more aggressive physical therapy and possibly traction, as that had helped her husband.  Dr. Sloyer noted that plaintiff had a reduced range of motion in her neck as well as tenderness upon palpation.  He recommended physical therapy.  In his notes from plaintiff's visit on October 19, 2010, Dr. Sloyer reported that plaintiff "would probably qualify for disability since she is unable to work due to her back."  Dkt. 8-1, at 457.

Plaintiff returned to Dr. Sloyer on November 5, 2010, still complaining of neck pain.  She claimed that oxycodone helped, but was too expensive.  Plaintiff still suffered from a decreased

range of motion in her neck and tenderness upon palpation. Dr. Sloyer's diagnosis was degenerative disc disease that did not seem to be getting any better. However, his notes indicate that plaintiff did "not want to do surgery." Dkt. 8-1, at 456. Plaintiff did not see Dr. Sloyer again until March 30, 2011, when she reported that she could hardly function without her pain medication. Dr. Sloyer noted that it had been at least a month since plaintiff had had her pain prescriptions refilled.

Simultaneous to her physical issues, plaintiff also saw Dr. Stanley I. Mintz, PhD on January 21, 2011, at the request of Disability Determination Services ("DDS") for a consultation. Plaintiff reported that she was bipolar but could no longer afford her medications. She alleged five or six suicide attempts, the most recent being sometime in 2010. Plaintiff also claimed that she was a psychiatric outpatient several times when she lived in Washington. Plaintiff indicated that she began using alcohol, cocaine, and marijuana at the age of twelve, and heroin at some point later. She claimed that she last abused alcohol in 2010, and last used cocaine and heroin seventeen years earlier. Dr. Mintz noted that plaintiff was able to bathe and dress herself, cook, and do the dishes and the laundry; however, plaintiff did not drive and she relied on her children to do her shopping and the rest of the housework. Dr. Mintz concluded that plaintiff might have difficulty relating well to coworkers and supervisors due to her bipolar symptoms and substance abuse issues. He diagnosed plaintiff with bipolar disorder without psychotic symptoms, alcohol abuse in partial remission, cannabis abuse (continuous), and polysubstance abuse in remission. He assigned her a Global Assessment of Functioning ("GAF") score of fifty-five (55).[1]

---

[1] The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV"), at 32. A GAF score of 55 indicates "moderate symptoms, such as a flat affect, or "moderate difficulty in social or occupational functioning." *Id.* at 34.

Plaintiff returned to Dr. Mintz for a second consultation on August 10, 2011.  Dr. Mintz noted similar findings to those he reported in January 2011, but also noted that plaintiff was somewhat agitated and labile during the evaluation.  She also appeared depressed and exhibited mood swings and symptoms consistent with bipolar disorder.  Dr. Mintz reported that plaintiff had the expectation that she could not work mainly from a somatic point of view.  He found her formal judgment, reasoning capacity, immediate attention span, and short and long-term memory to be intact and assessed her intellectual functioning to be within the borderline to low average range.  Dr. Mintz concluded that plaintiff would have difficulty functioning due to the accumulation of her mental symptoms, lifestyle habits, and negative attitude.  He also surmised that if plaintiff was to stop drinking and using marijuana, her chances of obtaining and maintaining employment would "be greatly increased."  Dkt. 8-1, at 575.  Dr. Mintz diagnosed plaintiff with bipolar disorder without psychotic symptoms, alcohol abuse (continuous), cannabis abuse (continuous), and polysubstance abuse (in remission) and assigned her a GAF score of fifty-five (55).

Also at the request of DDS, plaintiff saw Dr. Jay T. Hughey, DO for a consultation. Despite her reports of back and neck pain, plaintiff had completely normal evaluations of her lumbar and cervical spine, with normal ranges of motion.

Plaintiff filed for DIB and SSI on December 6, 2010, alleging disability beginning November 1, 2010.  Her claim was denied initially on March 4, 2011, and upon reconsideration on August 30, 2011.  Plaintiff timely filed a request for an administrative hearing, which took place on July 23, 2012, before Administrative Law Judge Christina Young Mein.  Plaintiff, who

was not represented by counsel, appeared and testified.[2]  Also testifying was Vocational Expert Alissa Smith and plaintiff's witness, Carol Sue Williams.

At the time of the hearing, plaintiff was forty-one years old and residing with her boyfriend and twenty-three-year-old daughter, who suffered from a traumatic brain injury. Plaintiff testified that, before her December 2009 car accident, she was a personal care attendant. In fact, she continued to work in such a capacity until August or September 2010.  Prior to that, she worked in a meat-packing plant and as an assistant manager/cashier in a retail store.  When asked what caused her to stop working, plaintiff testified that she had bowel problems, bipolar disorder, h-pylori, neck and back problems, and poor equilibrium and eyesight.  Plaintiff indicated that she had been prescribed several medications, but was not currently taking any of them because of financial constraints.

Plaintiff stated that although she had a driver's license, she only drove once a week, usually to the grocery store.  She testified that she spent four to eight hours per day watching television and used email and Facebook daily.  Plaintiff stated that she last used alcohol one to two months prior to the hearing and last used marijuana one year before the hearing.  She claimed that she took twenty to thirty aspirins per day because she could not afford prescription medication.  She also noted her use of a TENS unit, which she stated made the pain "a little bit more bearable."  Dkt. 8-1, at 49.

Plaintiff testified that she could dress and bathe herself most days but, on her "bad" days, she required a lot of assistance.  She claimed to experience five to six "bad" days for every one "real good day."  Dkt. 8-1, at 49.  She has help from her boyfriend or children with grocery shopping.  When asked to describe her typical day, plaintiff testified that she sat on the couch,

---

[2] The ALJ specifically asked plaintiff if she was interested in obtaining counsel, to which plaintiff answered in the negative.  Dkt. 8-1, at 35.

watched television, and laid down on the bed.  She indicated that she could not sit for long periods without transferring her weight around.  Plaintiff stated that she wanted to work but there was no way that anyone would hire her.

Plaintiff's mother, Carol Sue Williams, also testified.  Ms. Williams indicated that, before the accident, plaintiff worked as her caregiver, but she had to fire her "because she couldn't do the job."  Dkt. 8-1, at 52.  Ms. Williams later stated that plaintiff quit because she knew her mother was going to let her go.  Ms. Williams also testified that plaintiff's boyfriend was the one who actually took care of plaintiff's disabled daughter and did the household chores.

In addition to plaintiff's testimony and that of her mother, the ALJ also sought the testimony of the VE to determine how, if at all, plaintiff's impairments and limitations affected her ability to return to the workforce.  Based upon the previous testimony and her own review of the record, the ALJ asked the VE a series of hypothetical questions that included varying degrees of limitation on effort, skill, climbing, temperature, and contact with coworkers and the general public.  Although the VE indicated that, with the restrictions as set forth by the ALJ, the hypothetical individual could not perform plaintiff's past relevant work, she stated that there was other work in the national economy that an individual with such limitations could perform. When the ALJ inquired as to whether there would be any jobs available if the hypothetical individual needed to lie down during the workday, the VE answered in the negative.

The ALJ issued her decision on September 17, 2012, finding that plaintiff suffered from a variety of severe impairments including degenerative disc disease of the cervical and lumbar spines, bipolar disorder, and borderline personality disorder.  Despite these findings, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ concluded that plaintiff retained the residual functional capacity to perform light work with the following limitations: (1) only occasionally climb, balance, stoop, kneel, crouch, or crawl; (2) avoid concentrated extremes of cold temperature and excessive vibration; and (3) limited to simple, routine, repetitive tasks with no interaction with the public and only occasional interaction with coworkers and supervisors. The ALJ therefore concluded that plaintiff had not been under a disability, as that term is defined in the Social Security Act, since October 15, 2010. The ALJ's decision became the final decision of the Commissioner on December 27, 2013.

On February 28, 2014, plaintiff filed a Complaint in the United States District Court for the District of Kansas seeking reversal and the immediate award of benefits or, in the alternative, a remand to the Commissioner for further consideration. Given plaintiff's exhaustion of all administrative remedies, her claim is now ripe for review.

## II.    Legal Standard

Judicial review of the Commissioner's decision is guided by the Social Security Act (the "Act") which provides, in part, that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must therefore determine whether the factual findings of the Commissioner are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "Substantial evidence is more than a scintilla, but less than a preponderance; in short, it is such evidence as a reasonable mind might accept to support the conclusion." *Barkley v. Astrue*, 2010 U.S. Dist. LEXIS 76220, at *3 (D. Kan. July 28, 2010) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)). The court may "neither reweigh the evidence nor substitute [its] judgment for that of the

[Commissioner]." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.3d 799, 800 (10th Cir. 1991)).

An individual is under a disability only if he or she can "establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months." *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d)).  This impairment "must be severe enough that she is unable to perform her past relevant work, and further cannot engage in other substantial gainful work existing in the national economy, considering her age, education, and work experience." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *3 (citing *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002)).

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a).  The steps are designed to be followed in order.  If it is determined at any step of the evaluation process that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4.

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those severe impairments meets or equals a designated list of impairments. *Lax*, 489 F.3d at 1084; *see also Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4-5 (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).  If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's

Case 2:14-cv-02095-JTM   Document 14   Filed 03/13/15   Page 11 of 20

residual functional capacity, which is the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from her impairments." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5; *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

Upon assessing the claimant's residual functional capacity, the Commissioner moves on to steps four and five, which require the Commissioner to determine whether the claimant can either perform his or her past relevant work or whether he or she can generally perform other work that exists in the national economy, respectively. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5 (citing *Williams*, 844 F.2d at 751). The claimant bears the burden in steps one through four to prove a disability that prevents performance of his or her past relevant work. *Lax*, 489 F.3d at 1084. The burden then shifts to the Commissioner at step five to show that, despite his or her alleged impairments, the claimant can perform other work in the national economy. *Id*.

### III.     Analysis

Plaintiff alleges that the ALJ failed to properly assess her residual functional capacity. More specifically, plaintiff argues that the ALJ: (1) failed to assign weight to every opinion in the record and assigned the most weight to state agency consultants at the initial level; and (2) failed to issue a residual functional capacity that reflected the substantial evidence of record. Plaintiff's arguments are without merit.

### A.     Residual Functional Capacity Generally

"[R]esidual functional capacity consists of those activities that a claimant can still perform on a regular and continuing basis despite his or her physical limitations." *White v. Barnhart*, 287 F.3d 903, 906 n.2 (10th Cir. 2001). A residual functional capacity assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8p, 1996 SSR LEXIS 5, at

*19 (July 2, 1996).  The ALJ must also discuss the individual's ability to perform sustained work activities in an ordinary work setting on a "regular and continuing basis" and describe the maximum amount of work-related activity the individual can perform based on evidence contained in the case record.  *Id.*  The ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  *Id.*  However, there is "no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."  *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

**B.     Weight assigned to medical opinions**

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s) including the claimant's symptoms, diagnosis and prognosis."  *Terry v. Colvin*, 2015 U.S. Dist. LEXIS 9446, at *5 (D. Kan. Jan. 28, 2015) (quoting 20 C.F.R. § 416.927(a)(2)).  "Such opinions may be not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations."  *Id.* (citing 20 C.F.R. § 416.927(c)); *see also* SSR 96-5p, 1996 SSR LEXIS 2 (July 2, 1996).

"A physician or psychologist who has treated a patient frequently over an extended period of time (a treating source) is expected to have greater insight into the patient's medical condition, and his opinion is generally entitled to 'particular weight.'"  *Terry*, 2015 U.S. Dist. LEXIS 9446, at *5 (citing *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003)).  But, "the opinion of an examining physician (a non-treating source) who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."  *Id.* at *5-

6 (citing *Doyal*, 331 F.3d at 763). Opinions of non-treating sources are "generally given more weight than the opinions of non-examining sources who have merely reviewed the medical record." *Id*. at *6 (citing *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004)).

Plaintiff argues that the ALJ erred in according "great weight" to the opinions of non-examining physicians Drs. Dick A. Geis and Robin R. Reed because "[n]either consultant had the benefit of reviewing a year's worth of treatment records or review of the treating physician's opinions from Dr. Sloyer." Dkt. 9, at 13. "While it is true that courts have found that the opinion of non-examining physicians are worthy of the *least* weight, that is the *general* rule, and may be overcome when the ALJ provides a 'legally sufficient explanation for doing so.'" *Terry*, 2015 U.S. Dist. LEXIS 9446, at *25-26 (quoting *Robinson* 366 F.3d at 1084) (emphasis in *Terry*). Here, the ALJ provided specific, legitimate reasons for according "great weight" to the opinions of Drs. Geis and Reed and *stated* her reasons for doing so. Based on this court's review of the record, there is a legally sufficient reason for the ALJ's findings.[3]

### 1. Dr. Reed

In a March 2011 opinion, Dr. Reed, after reviewing plaintiff's medical records up to that point, concluded, among other things, that plaintiff was moderately limited in the following areas: (1) understanding and remembering detailed instructions, (2) carrying out detailed instructions, (3) maintaining attention and concentration for extended periods, and (4) interacting appropriately with the general public. Dkt. 8-1, at 87-88. Dr. Reed otherwise determined that plaintiff could carry out simple instructions, interact appropriately with supervisors and coworkers, and persist through a work day and workweek. Dkt. 8-1, at 10-11. The ALJ gave

---

[3] To the extent that plaintiff is arguing that the opinion of a non-examining physician can *never* constitute substantial evidence in support of an ALJ's decision, the court finds that argument to simply be contrary to the established authority. *See* 20 C.F.R. § 416.927(e), SSR 96-6p, 1996 SSR LEXIS 9 (July 2, 1996). Furthermore, plaintiff provides no support for such a claim.

great weight to the portion of Dr. Reed's opinion that concluded that plaintiff could "understand, remember and carry out simple, but not detailed, instructions; and that she would do best in a setting not working with the public." Dkt. 8-1, at 28.

Plaintiff takes issue with the fact that Dr. Reed's opinion was based somewhat on Dr. Mintz's 2011 evaluation of plaintiff, to which the ALJ seemingly assigned little weight. A reading of the ALJ's opinion, however, reveals that this is not exactly true. The ALJ assigned *great* weight to Dr. Mintz's January 2011 opinion and his conclusions about plaintiff's social functioning and her diminished ability to relate well to coworkers and supervisors. Dkt. 8-1, at 20-21. These same findings were adopted by Dr. Reed. Dkt. 8-1, at 10-11. The ALJ concluded also that Dr. Mintz's January 2011 evaluation, which is the only one of Dr. Mintz's evaluations to which Dr. Reed had access, better supported plaintiff's disposition than did his August 2011 opinion. Dkt. 8-1, at 27.

In his January 2011 opinion, Dr. Mintz noted that plaintiff was neat and clean in her appearance, well-dressed and groomed, and was alert and oriented as to time, place, person, and situation. Dkt. 8-1, at 524. She was intelligible and her thought processes were logical, coherent, and organized. Dkt. 8-1, at 524. Dr. Mintz noted that plaintiff might have difficulty relating to workers and supervisors, an opinion that Dr. Reed adopted and the ALJ incorporated into her limitations on plaintiff's residual functional capacity. The court therefore finds no error with regard to the ALJ's assignment of weight to Dr. Reed's opinion.

### 2.   Dr. Geis

Likewise, with regard to the opinion of Dr. Geis, the ALJ concluded that "[b]ased on his review of the record, knowledge of program requirements, and, most importantly, consistency of opinion with the record," it was entitled to great weight. Dkt. 8-1, at 26. Plaintiff argues that Dr.

Geis' opinion was based primarily on the conclusions of Dr. Jay T. Hughey, issued on August 13, 2011, to which the ALJ did not assign any weight. However, there is no mention of Dr. Hughey's findings in Dr. Geis' report. Dkt. 8-1, at 121-23. Dr. Geis concluded that plaintiff could: (1) occasionally lift and/or carry twenty pounds, (2) frequently lift and/or carry ten pounds, (3) stand and/or walk for a total of six hours in an eight-hour day, (4) sit for a total of six hours during an eight-hour day, and (5) engage in unlimited pushing and/or pulling. Dkt. 8-1, at 122. He also concluded that plaintiff could occasionally: (1) climb ramps, stairs, ladders, ropes, and scaffolds; (2) balance; (3) stoop; (4) kneel; (5) crouch; and (6) crawl. Dkt. 8-1, at 122. As the ALJ noted, these findings are consistent with the balance of plaintiff's record at the time Dr. Geis rendered his opinion.

Plaintiff's primary complaint focuses on her neck issues. She consistently reported improvement with medication, use of a TENS unit, and epidural injections. Dkt. 8-1, at 439, 446. She was also repeatedly assessed with full strength in her upper body. Dkt. 8-1, at 424, 440. While her radiological exams showed degenerative disc disease, this was described as somewhat mild in nature. Dkt. 8-1, at 437-38. Plaintiff's treatment record also belies the alleged severity of her symptoms. While her primary treating physician Dr. Sloyer initially sent her for nine weeks of chiropractic care, records show that plaintiff completed only approximately one month of such treatment, and missed at least three appointments, at that. Dkt. 8-1, at 405, 406, 415. The same was true for plaintiff's ordered physical therapy. Dkt. 8-1, at 444. In July 2010, Dr. Ebeling concluded that plaintiff was not a candidate for any further epidural injections and/or surgery and suggested that she "continue simple *conservative* measures." Dkt. 8-1, at 424 (emphasis added). Plaintiff also indicated to Dr. Sloyer that she did not want to undergo surgery.

Dkt. 8-1, at 456.  All of this information supports the ALJ's conclusion to afford Dr. Geis' opinion great weight.

With regard to plaintiff's timeliness argument, that the ALJ should not have relied on the opinions of consultative physicians whose own opinions were not based on the full record, the court finds that argument to be without merit.  While it is true that Drs. Reed and Geis rendered their opinions in March and August 2011, respectively, more than one year before the administrative hearing, plaintiff's submitted medical records show only minimal medical treatment after that point.  In fact, the only medical records in the record documenting plaintiff's care and/or treatment after March 2011 was one appointment with Dr. Sloyer on March 30, 2011, and a second opinion from state consultant Dr. Mintz, and Dr. Sloyer's opinion, rendered for purposes of this case, that plaintiff cannot sit, stand, or walk for periods of time and cannot lift. Dkt. 8-1, at 589.  The bulk of Dr. Sloyer's treatment (as well as that of plaintiff's other physicians) occurred before March 2011.  Therefore, the plaintiff demonstrates no error in the ALJ's evaluation of the opinions of the non-examining physicians.

### 3.        Dr. Sloyer

Plaintiff also argues that the ALJ erred in not assigning proper weight to Dr. Sloyer's opinion that plaintiff was unable to work. Dkt. 9, at 14.  It must be noted that this is not the traditional "treating physician rule" argument.  Plaintiff is not alleging that the ALJ failed to assign proper weight to Dr. Sloyer's opinion in its *entirety*; rather, she is alleging that the ALJ failed to take into consideration Dr. Sloyer's conclusion that plaintiff was unable to work. Plaintiff's argument is without merit.

In medical records dated October 19, 2010, Dr. Sloyer concluded that plaintiff "would probably qualify for disability since she is unable to work due to her back." Dkt. 8-1, at 457.  In

considering this conclusion, the ALJ stated that Dr. Sloyer's conclusion was "an administrative finding that is reserved to the Commissioner.  Although such opinions on these issues must not be disregarded, they can never be entitled to controlling weight or given special significance, even when offered by a treating source."  Dkt. 8-1, at 26.  The ALJ made clear in her decision that she considered, but ultimately disregarded, Dr. Sloyer's assessment because his "opinion that the claimant is disabled is based on minimal treatment and objective evidence and unsupported by the record as a whole . . . ."  Dkt. 8-1, at 26.

First and foremost, an opinion on whether or not a claimant is disabled is one specifically reserved for the Commissioner.

> Opinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

> (1) Opinions that you are disabled.  [The Commissioner is] responsible for making the determination or decision about whether you meet the statutory definition of disability.  In so doing, [the Commissioner] review[s] all of the medical findings and other evidence that support a medical source's statement that you are disabled.  A statement by a medical source that you are "disabled" or "unable to work" does not mean that [the Commissioner] will determine that you are disabled.

20 C.F.R. § 404.1527(d)(1); *see also Schafrick v. Colvin*, 2015 U.S. Dist. LEXIS 1730, at *5 (D. Kan. Jan. 8, 2015) (". . . the opinions regarding disability and employment are opinions on issues reserved to the Commissioner.").  Therefore, the fact that Dr. Sloyer labeled plaintiff as "unable to work" has no bearing on the Commissioner's final decision.

Furthermore, Dr. Sloyer's opinion is not even consistent with his own notes and treatment records.  Plaintiff's submitted medical records show that she began seeing Dr. Sloyer for back/neck issues immediately after her 2009 car accident.  On March 5, 2012, Dr. Sloyer opined that plaintiff could not sit, stand, or walk for periods of time, and could not engage in any

lifting.  Dkt. 8-1, at 589.  However, during the eight appointments plaintiff had with Dr. Sloyer between December 2009 and March 2011, Dr. Sloyer made no recommendations as to what plaintiff could or could not do, nor did he indicate that she had any limitations on her activity. Dkt. 8-1, at 456, 459-64, 554.  For that matter, *no* physician that plaintiff ever saw for her neck/back pain placed such limitations and restrictions upon plaintiff.  There seemed to be some evidence from plaintiff herself that pain medication helped her manage these issues but that she did not always have her medication refilled.  Dkt. 8-1, at 554.  Moreover, the evidence shows that plaintiff never followed through with a complete course of either chiropractic care or physical therapy as ordered.  Dkt. 8-1, at 405-06, 415, 444.  Furthermore, plaintiff herself admitted to working as a personal care attendant for nearly one year after her car accident, the alleged cause of her neck/back issues.  Dkt. 8-1, at 40-41.  Therefore, plaintiff has failed to show error with regard to the ALJ's treatment of Dr. Sloyer.

**C.      Substantial Evidence and Residual Functional Capacity**

Finally, plaintiff alleges that the ALJ's residual functional capacity finding is flawed because the ALJ did not identify additional impairments and functional limitations and the record actually shows more severe limitations than those adopted the ALJ.  More specifically, plaintiff alleges that the ALJ failed to state whether plaintiff's headaches, possible irritable bowel syndrome, gastroenteritis, shoulder pain, left arm/hand numbness, and bilateral knee pain were severe, non-severe, or even medically determinable.  Plaintiff's argument is without merit.

The Social Security Regulations require that a claimant establish either a physical or mental impairment "by medical evidence consistent of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."  20 C.F.R. § 404.1508.  Plaintiff claims that the evidence shows that she had difficulty holding things with her left hand due to numbness

and that she felt cramping in her hands when the pain medication wore off.  Dkt. 9, at 15.
According to plaintiff, the ALJ therefore should have included at least some limitation of
plaintiff's use of her left arm/hand or limited her to only occasional handling, fingering, and
feeling with the left hand.  Likewise, due to plaintiff's reported pain in her neck and shoulders,
the ALJ should have included some type of limitations on plaintiff's ability to reach overhead.

However, plaintiff's medical record does not contain any medical conclusions to support
such limitations.  Although plaintiff complained of these symptoms, no doctor, treating or
otherwise, found plaintiff to have such limitation.  Without such documentation, an ALJ is not
required to include such limitations in her residual functional capacity assessment.  20 C.F.R. §
404.1508; *see also* SSR 96-4p, 1996 SSR LEXIS 11, at *3-4 (July 2, 1996) ("Thus, regardless of
how many symptoms an individual alleges, or how genuine the individual's complaints may
appear to be, the existence of a medically determinable physical or mental impairment cannot be
established in the absence of objective medical abnormalities; i.e., medical signs and laboratory
findings.").

Ultimately, however, even if the ALJ did commit some error in this regard, such error is
harmless.  "An error at step two of the evaluation process can be harmless as long as the ALJ
finds some severe impairment or combination of impairments and proceeds to step three."  *Wood
v. Astrue*, 2012 U.S. Dist. LEXIS 112709, at *9 (D. Kan. Aug. 13, 2012) (citing *Carpenter v.
Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)).  Here, the ALJ found that plaintiff suffered from
three severe impairments: degenerative disc disease of the cervical and lumbar spines, bipolar
disorder, and borderline personality disorder and proceeded to step three accordingly.

Therefore, the court finds that the ALJ thoroughly reviewed the record and contemplated
all evidence regarding plaintiff's identifiable impairments.  After reviewing the record itself, the

court believes that evidence supports the ALJ's determination not to include headaches, possible irritable bowel syndrome, gastroenteritis, shoulder pain, left arm/hand numbness, and bilateral knee pain as severe impairments hindering plaintiff's ability to do work.  As a result, the court finds no error in the ALJ's residual functional capacity analysis.

**IT IS THEREFORE ORDERED** this 12th day of March, 2015, that plaintiff's appeal is hereby denied.

s\J. Thomas Marten
J. THOMAS MARTEN,
CHIEF JUDGE